**UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS**
**Washington, D.C.**

**UNITED STATES**

**v.**

**Shannon (NMN) LEE**
**Fireman (E-3), U.S. Coast Guard**

**CGCMG 0191**

**Docket No. 1200**

**1 June 2005**

General Court-Martial convened by Commander, Fourteenth Coast Guard District. Tried at Honolulu, Hawaii, on 20 – 21 May 2003.

| | |
|---|---|
| Military Judge: | CAPT Sharon W. Fijalka, USCG |
| Trial Counsel: | LT Mark M. Murakami, USCG |
| Defense Counsel: | LT Marcus S. Lawrence, JAGC, USNR |
| Appellate Defense Counsel: | LCDR Nancy J. Truax, USCG |
| Appellate Government Counsel: | LT Sandra J. Miracle, USCG |

**BEFORE**
**PANEL FOUR**
**BAUM, KANTOR, & HAMEL**
Appellate Military Judges

HAMEL, Judge:

Appellant was tried by general court-martial, military judge alone.  Pursuant to pleas of guilty, entered in accordance with a pretrial agreement, Appellant was convicted of two specifications of attempted wrongful possession of 20 tablets of Hydrocodone, a Schedule III controlled substance, one specification of attempted wrongful possession of 17 tablets of paracetamol, a Schedule III controlled substance, one specification of attempted wrongful possession of 72 tablets of nurofen, a Schedule III controlled substance, one specification of wrongful introduction of 3.637 grams of  psilocybin mushrooms, a Schedule I controlled substance, onto an installation under the control of the armed forces with intent to distribute, in violation of Article 80, Uniform Code of Military Justice (UCMJ); four specifications of

wrongful distribution of psilocybin mushrooms, a Schedule I controlled substance, one specification of wrongful manufacturing of psilocybin mushrooms, a Schedule I controlled substance, one specification of wrongful possession of alprozalam, a Schedule IV controlled substance, and one specification of wrongful introduction of psilocybin mushrooms, a Schedule I controlled substance, onto an installation under the control of the armed forces with the intent to distribute, in violation of Article 112a, UCMJ; two specifications of larceny, in violation of Article 121; and two specifications of forgery, in violation of Article 123, UCMJ.

The military judge sentenced Appellant to a bad-conduct discharge, confinement for twelve months, and reduction to E-1. The Convening Authority approved the adjudged sentence, but, suspended execution of confinement in excess of 300 days for a period of twelve months. The Convening Authority in the pretrial agreement agreed to have the period of suspension run from the date the sentence was announced; however, the action on sentence failed to state the date from which the suspension was to run. At this point, whether the period of suspension commenced on 21 May 2003, the date sentence was announced, or on 13 November 2003, the date of the Convening Authority's action, it is a moot issue since the probation period has already run as calculated from both dates.

Before this Court, Appellant has assigned two errors:

> I. THAT SINCE THE "MAGIC MUSHROOM" SPORES THAT
> HE PLANTED DID NOT GROW TO THE POINT OF
> PRODUCING A CONTROLLED SUBSTANCE, HIS GUILTY
> PLEA TO "PRODUCING" A CONTROLLED SUBSTANCE
> COULD NOT BE PROVIDENT. MOREOVER, APPELLANT'S
> PLEA TO WRONGFUL MANUFACTURE OF PSILOCYBIN
> MUSHROOMS, A SCHEDULE I CONTROLLED SUBSTANCE,
> IS IMPROVIDENT BECAUSE THE SUBSTANCE
> MANUFACTURED, IF ANY, WAS NOT A CONTROLLED
> SUBSTANCE OR OF A CONTRABAND NATURE; AND
> APPELLANT'S STATEMENT THAT HE BELIEVED THAT
> POSSESSION OF MUSHROOM SPORES IS LEGAL AS LONG
> AS THERE IS NO INTENT TO GROW THEM, MADE AFTER
> THE MILITARY JUDGE EXPLAINED THE ELEMENTS AND
> DEFINED THE RELEVANT TERMS, WAS INCONSISTENT

WITH THE LAW AS EXPLAINED BY THE MILITARY
JUDGE.

II.  APPELLANT WAS SUBJECTED TO ILLEGAL PRETRIAL
PUNISHMENT IN VIOLATION OF ARTICLE 13, UCMJ.


**Assignment I**


Appellant entered into a Stipulation of Fact in which he admitted to "wrongfully manufactur[ing] some psylocibin [sic] mushrooms, a Schedule 1 controlled substance."  The Stipulation of Fact continued, "I went online and purchased a 'Magic Mushroom' growing kit.  I received the kit, planted the seeds according to the included instructions.  I kept the plantings in my house on the Navy base in Guam.  During the search of my residence, investigators found the growing kit with seeds.  I knew that those seeds would produce psylocibin mushrooms and it was my intention to grow those mushrooms. . . I knew the mushrooms I had received were illegal mushrooms because I had previously seen illegal mushrooms."


When questioned by the military judge, Appellant admitted that he had purchased a "magic mushroom growing kit" online.  He admitted further that, following the instructions enclosed with the kit, he had planted the mushroom spores.  However, at this point he went on to explain that the spores he planted never grew into mushrooms.  A colloquy then ensued between the military judge and trial counsel as to how Appellant could be convicted of "manufacturing" a controlled substance if the seeds did not germinate and grow to produce the illegal mushrooms.  Trial counsel offered, and the military judge accepted that, "manufacture," under Article 112a, UCMJ, includes "production," which is itself defined to include "planting, cultivating, growing or harvesting."  Manual for Courts-Martial (MCM), Pt. IV, ¶ 37c(4) (2002).


The military judge returned to this issue when inquiring into the providence of the Appellant's guilty plea on this charge and specification.  The military judge explained the elements of the offense of wrongful manufacture of a controlled substance, and defined the term "manufacture" to include "production," and defined "production" to include planting.  The military judge questioned Appellant as to his understanding of each element of the offense but

did not take up the issue earlier deferred, whether "planting" a non-contraband substance, mushroom spores, alone was sufficient to produce a violation of Article 112a, UCMJ.

On the basis of the scientific studies described in Appendix A of Appellant's brief, *Detecting Psychoactive Drugs in the Development States of Mushrooms*, J. Forensic Sci 2000, 45(3), pp. 527-537, Appellant argues that the controlled substance, psilocybin, or psylocin as it is sometimes called, is not present until the plant reaches the third of its four stages of development, that since the "magic mushroom" spores did not grow to the point of producing a controlled substance, his guilty plea to "producing" a controlled substance could not be provident. Appellant allows that while his plea to "manufacturing" a controlled substance should not be considered provident on these facts and in light of the scientific evidence Appellant presented in Appendix A, he could be convicted, under Article 80, UCMJ, of attempting to manufacture a controlled substance. We agree with Appellant and substitute a finding of guilty to attempting to manufacture a controlled substance in place of the military judge's finding of guilty to actually manufacturing the controlled substance, psilocybin, or psylocin.

We decline to accept the Government's proposition that, when it comes to the production of psilocybin mushrooms, an accused need merely plant the non-contraband mushroom spores with the intent to wrongfully produce the controlled substance for the violation of Article 112a, UCMJ, to be complete. We find that, for the offense to be complete, the controlled substance must be actually present in the cultivated planting. Failing that, as here, the accused is guilty of, at most, an attempt to produce a controlled substance in violation of Article 112a, UCMJ.

Here, we find the offense of attempted production complete, on the basis of Appellant's testimony and the Stipulation of Fact. Appellant ordered a "magic mushroom" growing kit over the Internet. He did so for the express purpose of growing mushrooms containing the controlled substance psilocybin, or psylocin. He received the kit, and, following the instructions enclosed with the kit, planted mushroom spores with the specific intent of growing the contraband mushrooms, acts that amounted to more than mere preparation. The crime would have been complete were it not for the intervention of circumstances not foreseen by Appellant which prevented the spores from germinating and growing into mushrooms containing the controlled

substance. After reassessing the sentence under the substituted finding of guilty, we decline to adjust the sentence.

## Assignment II

We hold that Appellant was punished prior to trial in violation of Article 13, UCMJ, and award ten days constructive credit. The facts surrounding the granted issue are set out below.

Following the hospitalization and treatment of a crew member for apparent ingestion of psilocybin mushrooms on 19 July 2002, the Commanding Officer, USCGC SASSAFRAS (WLB 401) sought an received investigative assistance from the Coast Guard Investigative Service (CGIS) to inquire into illegal drug use aboard the cutter. Within two weeks, the CGIS investigation identified twelve SASSAFRAS crew, including Appellant, as potentially involved in illegal drug use. The Commanding Officer directed the CGC SASSAFRAS Executive Officer to administratively re-assign these twelve crewmembers to Coast Guard Marianas Section (MARSEC), the Coast Guard shore command where CGC SASSAFRAS' homeport moorings were located.[1] The Commanding Officer also directed the SASSAFRAS Executive Officer to require the departing crewmembers to surrender their unit ball caps and tee shirts, items that identified them as CGC SASSAFRAS crewmembers. He did this, ostensibly, to ensure they wore the same uniform as personnel permanently assigned to MARSEC, Coast Guard working blue, but also to limit the possibility of those twelve crewmembers being connected with illegal drug use on the SASSAFRAS while assigned to MARSEC. The Commanding Officer directed that they not be allowed onboard SASSAFRAS at any time until cleared of suspicion of wrongful narcotics use. The SASSAFRAS Executive Officer accomplished these instructions after coordinating with the MARSEC Executive Officer. The twelve crewmembers were administratively assigned to MARSEC in early August 2002. They packed their sea bags, surrendered their SASSAFRAS ball caps and tee shirts and departed SASSAFRAS. They were not permitted to return to the cutter and did not assist in shipboard maintenance.

---

[1] Shortly after the twelve crewmembers were administratively assigned to MARSEC, the Coast Guard Investigative Service cleared two of them. Those two crewmembers were returned to CGC SASSAFRAS, leaving ten former SASSAFRAS crewmembers assigned to MARSEC. Over the following weeks, nine of the remaining crewmembers

The MARSEC Executive Officer initially directed that the twelve crewmembers be assigned to workshops where they would be able to perform duties consistent with their training and experience. They quickly proved to be a significant supervisory burden. MARSEC supervisors reported that the twelve crewmembers failed to report on time, failed to report back from lunch and breaks, and failed to complete assigned tasks. Indeed, the guidance and direction they required were beginning to detract from the accomplishment of MARSEC projects. The MARSEC Executive Officer engaged the SASSAFRAS Executive Officer, who agreed to "loan" the SASSAFRAS Master at Arms (MAA), the Boatswain's Mate Chief Petty Officer, to MARSEC to supervise them. The twelve former crewmembers of the SASSAFRAS were put under the direct supervision of the SASSAFRAS MAA. The MARSEC Executive Officer directed the MAA to muster them three times daily and to "keep them busy."

For the next seven weeks, as found by the military judge, they mustered three times daily, at 0730, 1230, and 1600. For at least some of the time, they mustered on the pier under the supervision of the SASSAFRAS MAA. Following musters, they performed a variety of maintenance duties. These duties, as found by the military judge, included "sweeping down the pier, hosing down the pier, removing excess water from the pier, removing weeds or other organic growth from the pier and adjacent grassy area, cleaning out a storage shed, removing accumulated rust from the buoy yard, maintaining a cabana picnic area, and other general maintenance tasks shore-side following typhoons that hit Guam in early June 2002." The "pier" on which maintenance was performed was the pier to which SASSAFRAS was moored, thus the pier maintenance was conducted where it could be observed by any crewmembers of the SASSAFRAS, who were themselves working on the cutter's weather decks. From time to time, pier maintenance included the removal of standing water that had accumulated from passing rain showers. Tools issued for the performance of this task included sponges and "fox tails." While it is clear from the record that tools more suitable to the task of pier maintenance were sometimes issued to the work detail, it is equally clear that members of the work detail were

---

were administratively separated from the Coast Guard, not including the Appellant in the instant case, who remained administratively assigned to MARSEC.

sometimes required to work on their hands and knees "de-puddling" the pier with sponges and sweeping debris and trash with "fox tails."

At trial, Appellant made a timely motion for appropriate relief in the nature of thirty-five days of confinement credit for illegal pretrial punishment in violation of Article 13, UCMJ. Appellant argued that during the course of the CGIS investigation, while he was assigned to MARSEC, Appellant was segregated from SASSAFRAS, required to surrender clothing that identified him as a member of the SASSAFRAS crew, required to muster three times daily, and to perform demeaning tasks, including "de-puddling" the pier using sponges and sweeping the pier using a foxtail brush, all as punishment for the alleged misconduct that gave rise to charges against Appellant in the instant case. The military judge found that while the former SASSAFRAS crewmembers were "at times . . . required to perform their pier maintenance tasks with tools that were sometimes inadequate for the scope of the tasks assigned," the work "was not intended to humiliate or degrade them, notwithstanding the fact that they did not always have the best tools for the tasks."[2] In reaching these conclusions, the military judge had before her the Stipulation of Fact, and the testimony of the MARSEC and SASSAFRAS Executive Officers.

We begin with the proposition that "[w]hen a Court of Criminal Appeals reviews a military judge's rulings, it has the 'awesome, plenary, *de novo* power of review' to substitute its judgment for that of the military judge. In point of fact, Article 66(c), requires the [now Court of Criminal Appeals] to use its judgment to 'determine, on the basis of the entire record' which findings and sentence should be approved." *United States v. Armstrong*, 54 M.J. 51, 54 (C.M.A. 2000) (quoting *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)).

We are convinced that while there may have been a legitimate military purpose for many of the conditions and circumstances to which Appellant was subjected after becoming suspected of wrongful use and distribution of narcotics, the manner in which he was required to clean and "de-puddle" the pier violated Article 13, UCMJ.

---

[2] The military judge made similar findings with respect to the removal from the ship, the thrice-daily muster and the requirement that Appellant surrender his SASSAFRAS ball cap and tee shirts. She found these orders served a legitimate military purpose and were not done to punish or stigmatize the former SASSAFRAS crewmembers.

Article 13, UCMJ, proscribes purposefully imposing punishment upon an accused prior to the adjudication of guilt or the infliction of unduly rigorous circumstances during pretrial detention, which, if sufficiently egregious, may give rise to a permissible inference that an accused is being punished. *United States v. Singleton*, 59 M.J. 618, 621 (A.Ct.Crim.App. 2003) (citing *United States v. McCarthy*, 47 M.J. 162, 165 (C.A.A.F. 1997)). Whether there has been unlawful pretrial punishment is determined with reference to the totality of the circumstances. Conditions are not deemed "unduly rigorous" if under the totality of the circumstances they are reasonably imposed pursuant to legitimate governmental interests. *Singleton*, 59 M.J. at 621; *See McCarthy*, 47 M.J. at 168. Other courts, in evaluating the circumstances surrounding the alleged unlawful punishment, have looked to evidence of intent to punish. "The question of intent to punish is 'one significant factor in [the] judicial calculus' for determining whether there has been an Article 13 violation." *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002) (citing *United States v. Huffman*, 40 M.J. 225, 227 (C.M.A. 1994)).

We are not inclined to disturb the findings of the military judge as to most aspects of the Appellant's treatment while assigned to MARSEC, including the thrice-daily musters, confiscation of unit ball caps and tee shirts and the character of the work assigned to Appellant. She found no intent to punish, humiliate or degrade Appellant in the application of each of these techniques. Subject to the qualification below, we are inclined to let these findings stand. Although we view some of these techniques, particularly the confiscation of unit ball caps and tee shirts, with concern, we will not substitute our judgment as to the legitimacy of the underlying military purpose of these measures for that of the military judge.[3] However, with respect to the manner in which Appellant and others were required to clean and "de-puddle" the pier from time to time, we will substitute our findings for those of the military judge and grant appropriate relief.

We will infer the intent to punish from the manner in which Appellant was required to clean the pier and the circumstances surrounding the performance of that duty. Requiring the

---

[3] In our view, the SASSAFRAS Commanding Officer, through his Executive Officer, could have ordered the departing SASSAFRAS crew to wear the MARSEC uniform of the day and prohibited them from wearing SASSAFRAS ball caps and tee shirts. It was not necessary to confiscate them. This confiscation approaches an Article 13, UCMJ, violation.

Appellant to clean the pier with a foxtail and to remove puddles with a hand-held sponge, both of which required him to perform the assigned work on his hands and knees in front of his former shipmates, was a form of punishment. The Government advanced no legitimate military purpose for the removal of standing water on the pier and we see none ourselves. This work, performed as it was by persons under investigation for violations of narcotics laws in full view of their former shipmates, was humiliating and degrading. It was a form of pretrial punishment and, as such, it was imposed in violation of Article 13, UCMJ.

Having determined that the manner in which Appellant was required to perform some of the work he was assigned to complete constituted illegal pretrial punishment, we turn to the issue of the remedy appropriate to redress this circumstance. Our task is complicated somewhat by the limited extent to which defense counsel developed the record in this respect. The frequency with which the pier maintenance was performed by using sponges for "de-puddling" and foxtails for sweeping can not be clearly ascertained from the record. The Stipulation of Fact entered by the Appellant indicates that "I didn't perform each of these tasks every day . . ." The cutter's Executive Officer testified to having observed this activity on only one occasion during a two week period. Appellant produced no evidence, beyond the Stipulation of Fact and that adduced on cross-examination, concerning the frequency that the pier maintenance was performed using sponges and foxtails. In the absence of a more definitive basis to award relief, we will award ten days constructive credit. We base this on the two week period during which the SASSAFRAS Executive Officer testified that the former SASSAFRAS crew worked under the SASSAFRAS MAA's supervision and were seen by her, on at least one occasion, performing pier maintenance in this manner.

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the finding of guilty of one specification of wrongful manufacturing of psilocybin mushrooms, a Schedule I controlled substance, is set aside and the lesser included offense of attempted manufacturing of psilocybin mushrooms is affirmed. The remaining findings of guilty are affirmed, and the sentence has been reassessed in light of the reduced manufacturing offense. After reassessment, we have determined that a lesser sentence would not have been imposed if the error with respect to manufacturing had not occurred. Moreover, the approved sentence is

9

deemed to be appropriate for this Appellant and his offenses and will not be modified based on a lessened manufacturing offense. The sentence is determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the sentence, as approved below, is affirmed; however, Appellant is credited with ten days confinement based on our determination that he was subjected briefly to pretrial punishment in violation of Article 13, UCMJ. Since his approved confinement has already been served, the only likely effect of this crediting will be with respect to automatic forfeitures under Article 58b, UCMJ for periods of confinement. Pay forfeited during this ten-day period of confinement shall be returned to Appellant.

Chief Judge BAUM concurs.

KANTOR, Judge (concurring in part and dissenting in part):

I concur with all but that portion of the majority opinion that holds, as improvident, the Appellant's plea to the wrongful manufacture of psilocybin mushrooms, a Schedule I controlled substance, to which I respectfully dissent. The majority holds, in effect, that there can be no conviction for the wrongful manufacture of a controlled substance until, in this case, the "magic mushroom" spores grew to the point of producing a controlled substance. I disagree with that conclusion, believing that the Article 112a, Uniform Code of Military Justice (UCMJ) offense of wrongful manufacturing of a controlled substance was completed when the mushroom spores, even though not themselves a controlled substance, were planted by the Appellant.

Article 112a, UCMJ prohibits, among other things, the wrongful manufacture of a controlled substance. The Manual for Courts-Martial (MCM), Pt. IV, ¶ 37c(4) (2002) defines "manufacture" as "the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of such substances or labeling or relabeling of its container." MCM, Pt. IV, ¶ 37c(4). "Production" is also defined in this paragraph to include "the planting, cultivating, growing, or harvesting of a drug or other

substance." MCM, Pt. IV, ¶ 37c(4). Taken together, the plain meaning of these two definitions leads to the inescapable conclusion that there is an Article 112a, UCMJ, violation when a non-controlled substance is planted that eventually "produces" a controlled substance. Such would have been the result in this case since the mushroom spores, if allowed to grow, would have produced the psilocybin mushrooms. I believe this view is further supported by the United States Department of Justice, Office of Legal Education's publication, *Federal Narcotics Prosecutions*. Section 14.3 of that publication describes manufacturing as an ongoing process, which may involve many stages that occur over an extended period of time. Office of Legal Educ., Dep't of Justice, *Federal Narcotics Prosecutions*, § 14.3 (Feb. 1999).

Also significant to this issue is the use of the phrase "of a drug or other substance" in both the definition of "manufacture" and "production." The use of this phrase certainly contemplates the use of materials other than drugs, as long as the final product itself is a controlled substance.

Finally, adopting Appellant's argument on this issue would eliminate any distinction between the crimes of possessing a controlled substance and manufacturing a controlled substance. If, as Appellant suggests, "for Appellant to have manufactured a controlled substance, the spores, then later the mycelium, would have had to mature at least into primordial" because that is the first stage of the mushroom development process that contains psilocybin, Appellant would also have been guilty of possessing a controlled substance. Wrongful manufacturing is designed to criminalize a completely different set of actions not covered by mere possession, that being actions that eventually result in the creation of a controlled substance.

I would, thus, affirm the findings with regard to specification 5 of Charge II.



For the Court,

Roy Shannon Jr.
Clerk of the Court